**In re Richard Harmes ROSSMILLER a/k/a Dick Rossmiller, Debtor.**

**Gerald PRIDDY, d/b/a Estate Liquidators Auction Galleries, Appellant,**

**v.**

**FIRST NATIONAL BANK OF ARVADA and Federal Deposit Insurance Corporation, Appellees.**

**Civ.A. No. 92–K–1167.**
**Bankruptcy No. 89 B 13973 C.**

United States District Court,
D. Colorado.

Dec. 7, 1992.

See also 140 B.R. 1000.

Roy W. Penny, Jr., Denver, CO, for appellant.

Pamela Strauss, Bruce E. Rohde, Denver, CO, for appellees.

## MEMORANDUM DECISION ON APPEAL

KANE, Jr., Senior District Judge.

This case is before me on Gerald Priddy's ("auctioneer") appeal from an order of the bankruptcy court denying him compensation for auctioning off numerous personal properties of the bankrupt, Richard Rossmiller. The bankruptcy judge concluded that Priddy had been dishonest in his fee application when he failed to reveal a ten per cent buyer's premium he had collected and kept for himself. The buyer's premium was in addition to a twenty per cent commission on the gross price of the items sold. As a sanction, the bankruptcy court refused to award any compensation to the auctioneer, thereby depriving him of between $24,000 and $39,000. For the reasons discussed below, I reluctantly reverse and remand for a further hearing on the appropriateness of sanctions.

### I. Facts and Procedural History

Richard Rossmiller filed a chapter 7 petition on October 13, 1989. In his possession at the time was a considerable amount of furniture, antiques, art work and other personal property ("property"). A number of people and institutions claimed an interest in the property, including the First National Bank of Arvada ("Bank"), the auctioneer, Mr. Rossmiller's wife, the trustee, and the FDIC. To resolve the dispute, the trustee filed an adversary proceeding in the nature of a quiet title action.

The parties settled the adversary action by a stipulation they signed in May, 1991. By its terms, Mr. Rossmiller and his wife surrendered possession of the property and the auctioneer released his claims. The bank and the trustee agreed to pay the auctioneer a 20% commission on the sale of the property, together with reasonable costs and expenses incurred in gathering the property and transporting it to Denver from San Diego for sale and auction.

On June 28, 1991 the trustee filed an application in the bankruptcy court to hire the auctioneer. The trustee revealed that he intended to pay the auctioneer "a fee of twenty percent of the proceeds of the sale plus storage and cartage." The auctioneer's affidavit in support of the application promised to submit a complete itemization of assets, equipment, and the proceeds, less a twenty percent commission on the total amount as well as necessary costs and ex-

penses incurred in liquidating the estate. The bankruptcy court approved the application on July 30, 1991. The auctioneer sold the debtor's property during the month of September, 1991. At the sale, the auctioneer charged a 10% buyer's commission on every item sold. That is, if a buyer successfully bid $200 for a picture, the buyer actually paid the auctioneer $220.

The auctioneer prepared an Auctioneer's Report listing the items sold and their sale price. The report suggests that the proceeds of the auction were $122,924. This figure, however, did not reflect the 10% buyer's premium. When the bank learned of the 10% buyer's premium, the auctioneer filed an application for approval of his fees and costs on December 16, 1991. It provided, in pertinent part:

> Auctioneer's counsel has been advised that a question may be raised as to the validity of the Auctioneer's customary Buyer's Premium. At the time that the Auctioneer conducted the sale, there were posted on the premises, as there have been for many years, signs indicating that a 10% Buyer's Premium would be added to the bid price of all merchandise sold. These signs were present and clearly visible when Creditor's Counsel visited the auction gallery prior to the sale. As indicated on those signs, and in conformance with the auctioneer's practice for many years, a 10% Buyer's Premium was added by the Auctioneer to all bid prices. The Buyer's Premium is not reflected in the foregoing accounting because it is paid directly to the Auctioneer and represents monies which would not otherwise have been received by any party or person interested in the debtor's estate. The Auctioneer has charged a Buyer's Premium ... in previous engagements for the Federal Bankruptcy Court, and other federal agencies.... The auctioneer accepted the within assignment with the understanding that the sale would include the customary Buyer's Premium.

The auctioneer filed an amended application on January 21, 1992. It disclosed that gross proceeds from the auction were $122,924 and expenses were $11,855.48,

thus entitling him to a commission of $24,-584.80. In itemizing the expenses, the auctioneer explained that he incurred $5,717.68 in July, 1990 while gathering "certain property of the estate."

The court held a hearing on the objections to the amended application on April 13, 1992. There, the auctioneer testified that he had been charging a buyer's premium for five years in various bankruptcy cases and that no one had ever complained. He also admitted he did not seek relief from the automatic stay or other court approval before gathering the property in July, 1990. He explained that he had made the trip to San Diego because Mr. Rossmiller was moving from a larger house to a smaller house and no longer had room for all the property. "[I]n order to preserve and protect the household goods in which I and others claimed interest, I incurred certain expenses in order to gather the property in California."

On May 28, 1992, the bankruptcy court entered a written order denying the auctioneer all fees and costs and affirmatively ordering him to disgorge the buyer's premium to the trustee. 140 B.R. 1000. This appeal followed.

## II. Discussion

### A. Standard of Review

I review the bankruptcy court's decision on an abuse of discretion standard. *White v. General Motor's Corp., Inc.*, 977 F.2d 499 (10th Cir.1992) ("*White II*"). "Reversal is appropriate only if the court 'based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.'" *Hughes v. City of Fort Collins*, 926 F.2d 986, 988 (10th Cir.1991) (quoting *Cooter & Gell v. Hartmax Corp.*, 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990)).

### B. The Legal Basis for Denying Compensation

The bankruptcy court used two theories in concluding that the auctioneer should be denied all compensation. First, it canvassed case law relevant to employment of professionals under 11 U.S.C. 327. See,

generally, *In re Flying E Ranch Co.*, 81 B.R. 633 (Bankr.D.Colo.1988); *In re Western Office Partners, Ltd.*, 105 B.R. 631 (Bankr.D.Colo.1989). The bankruptcy court concluded from this review it was entirely appropriate to deny compensation to any professional who failed to be forthright in disclosing potential conflicts of interest to the court.

The bankruptcy court recognized, however, that the auctioneer was not appointed pursuant to § 327. Thus, it looked to Fed. R.Bankr.P. 9011(a) as a basis for imposing sanctions against the auctioneer. The bankruptcy court thought the auctioneer's failure to disclose all of the relevant terms of his compensation was a violation of rule 9011(a). It understood *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.*, 498 U.S. 533, 111 S.Ct. 922, 112 L.Ed.2d 1140 (1991), to allow sanctions against both individuals and lawyers. The bankruptcy court found that the auctioneer had committed a blatant and egregious violation of Rule 9011 and accordingly harshly sanctioned him for his lack of candor and disclosure.

### C. Rule 11 Sanctions

In *White v. General Motors Corp.*, 908 F.2d 675 (10th Cir.1990), ("*White I*") the circuit set out in detail the law and procedure a court must follow before imposing sanctions under Rule 11. First, the court must apply an objective standard to the conduct, not a subjective standard. The actor's subjective good faith in his actions will not prevent the imposition of sanctions. His "actions must be objectively reasonable in order to avoid Rule 11 sanctions." 908 F.2d at 680. Second, the court must recognize that deterrence is the primary goal of sanctions. *Id.* at 683. Third, an award of attorney fees is not the only appropriate sanction for a Rule 11 violation. Rather, it "is but one of several methods of achieving the various goals of Rule 11." *Id.* Fourth, in imposing monetary sanctions a court must "expressly consider at least the following circumstances" in determining the appropriateness of the particular sanction: whether the fees are reasonable; whether the sanction is the minimum amount that will serve to deter adequately the undesired behavior; whether the offender has the ability to pay the sanctions; and whether a number of other factors (past sanction history, experience, severity of the violations, and the like) make sanctions more or less appropriate. *Id.* at 684–85. Finally, sanctions need to be appropriate not only in amount but also levied upon the person responsible for the violation. *Id.* at 685–86.

The bankruptcy court found a violation of the Rule 9011 objective standard of good faith. The auctioneer claims there was insufficient evidence to support the bankruptcy court's finding of bad faith. I disagree. Under Rule 11, "a signature certifies to the court that the signer has read the document, has conducted a reasonable inquiry into the facts and law and is satisfied that the document is well-grounded in both." *Business Guides*, 498 U.S. at ——, 111 S.Ct. at 928. The court noted that the auctioneer was not a neophyte in the bankruptcy arena. The auctioneer testified in writing that he had conducted approximately thirty sales on behalf of the bankruptcy court in the past five years. When ordered, however, to produce the records of those sales, the auctioneer objected vehemently, claiming that he had not had appropriate notice that his past practices would be in issue at the April hearing. When he finally disclosed his earlier involvement as an auctioneer for the bankruptcy court, he tried to minimize it. He claimed to have been involved in only four bankruptcy auctions—the remaining 26 referred to in his written testimony he said were conducted under the auspices of the FDIC.

The bankruptcy court concluded that the auctioneer was not a credible witness. Such a determination is specifically entrusted to the trier-of-fact. The auctioneer initially tried to suggest through his testimony that the buyer's premium was a tried and true practice of his, so well-known to the bankruptcy court that it should be allowed in this case as well. Such familiarity cuts two ways, however, for it equally supports the court's conclusion that the auctioneer was familiar with bankruptcy court

practices and procedure, and thus supports the finding of bad faith. The auctioneer's later attempts at minimizing the number of bankruptcy auctions only buttresses the conclusion. The bankruptcy court was free to evaluate those attempts. In short, ample and sufficient evidence supported the bankruptcy court's decision. It did not abuse its discretion *in finding* that the auctioneer acted in bad faith and in violation of Rule 9011.

■ I am troubled, however, because the bankruptcy court did not address expressly the other factors, recently required by *White I*, especially whether the denial of all compensation is the minimum sanction that will both deter and punish and whether sanctions should have been assessed against the auctioneer alone.

Early in this opinion I said I was reluctant to reverse. I think an explanation is required. Absent the decision in *White I*, the bankruptcy court's decision would merit summary affirmance. *White I*, however, contains an unfortunate, fractious requirement that the court determine whether the denial of all compensation is the minimum sanction that will both deter and punish. On a practical basis, the directive is nearly impossible to follow.[1] On a jurisprudential basis, it is the kind of minimalist functioning which defeats the very object of the underlying rule. By this I do not suggest that imposition of sanctions should be rhadamanthine. Rather, such a minimalist directive invites caprice in the initial determination and conjecture in the subsequent review—a review encouraged if not mandated by the rule itself. Accordingly, this case is remanded for the bankruptcy court to consider whether the denial of all compensation is the minimum sanction that will both deter and punish, whether sanctions should be imposed on the auctioneer only, and whether the other factors identified in *White I* make sanctions more or less appropriate, all as the tenth circuit requires.

---

1. What should the judge consider minimal? $10.00? $100.00? $1000.00? Or should there be an articulable standard rightly and justly enforced?