In the Matter of Richard Harmes
ROSSMILLER a/k/a Dick
Rossmiller, Debtor.

Gerald PRIDDY d/b/a Estate Liquidators
Auction Galleries, Appellant,

v.

Clifford E. ELEY, Trustee, Appellee.

No. 93–K–2574.

United States District Court,
D. Colorado.

May 18, 1995.

Jay L. Gueck, Gueck Davis Seeberger & Siegel, Dallas, TX, Roy W. Penny, Jr., Wehrle & Penny, P.C., Denver, CO, for appellant.

Clifford E. Eley, Trustee, Denver, CO, pro se.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

This matter is before me for the second time on appeal. The bankruptcy court originally imposed sanctions against Gerald Priddy pursuant to Fed.R.Bankr.P. 9011 in May 1992. Priddy appealed. I upheld the bankruptcy court's finding of Priddy's bad faith and liability. Nevertheless, I reversed and remanded because the bankruptcy court did not expressly consider all the factors enumerated in *White v. General Motors Corp.,* 908 F.2d 675 (10th Cir.1990) ("*White I*"), *Priddy v. First National Bank of Arvada (In re Rossmiller)*, 148 B.R. 326 (D.Colo. 1992).

To comply with the mandate, the bankruptcy court held another hearing regarding the appropriateness of sanctions and then a hearing focusing on possible sanctions against his attorney, Richard Gleason. Thereafter, the bankruptcy court exonerated Gleason and went through the *White I* factors step by step finding Priddy's bad faith in severe violation of Rule 9011. Here, Priddy appeals the bankruptcy court's seven-page decision with three separate briefs spanning fifty pages.

I affirm the bankruptcy court. Priddy makes numerous legal arguments for reversal. These arguments hang together by a slender thread: Priddy's testimony. The bankruptcy judge, however, found Priddy equivocated or demonstrated bad faith in his testimony. In my first decision I affirmed this finding. Upon remand, the bankruptcy judge effectively followed the first decision mandating consideration of all the *White I* factors. Accordingly, I affirm.

## I.  BACKGROUND

In summary, Priddy was sanctioned for charging an undisclosed buyer's premium at the auction he ran selling the debtor, Rossmiller's, property. The parties previously agreed to compensate Priddy with 20% of the gross proceeds. At the sale he charged a 10% premium on each sale, pocketed the premium and then applied to the court for his 20% commission of the remaining proceeds. The bankruptcy judge sanctioned Priddy for signing his affidavit and the court-approved stipulation specifying he would receive a 20% commission as compensation and mentioning nothing about an additional buyer's premium.

This dispute originates in Richard Rossmiller's 1989 Chapter 7 bankruptcy petition. A number of parties, including the First National Bank of Arvada ("Bank") and Priddy, claimed an interest in the considerable quantity of personal property Rossmiller possessed at the time he filed his petition. The trustee filed an adversary action to resolve the disputed claims and the parties agreed to settle by stipulation in May 1991. The stipulation signed by the parties and approved by the court compensated Priddy with 20% of the "gross proceeds" of the sale and for reasonable costs in collecting the property and bringing it from San Diego to Denver. (R. Appeal, Vol. 1, Doc. 144.) The Bank claimed the agreed 20% commission was higher than customary rates for auctioneers in consideration for Priddy releasing his disputed claims. (R. Appeal, Vol. 1, Doc. 180 at 4.) The court order noted, "all such fees and expenses are subject to prior court approval." (*Id.*) Priddy also filed a signed affidavit

allotting him 20% of the "total amount" of the sale of the property and payment of necessary costs. (R. Appeal, Vol. 1, Doc. 141.)

In its first decision, the bankruptcy court established the following facts regarding the auction. Priddy held the auction in September where signs advised buyers they would be charged a 10% buyer's premium. (R. Appeal, Vol. 1, Doc. 180 at 3–6.) In December Priddy applied to the court for fees and expenses asking for 20%, or $24,584.80 of the $122,924.00 in proceeds. (*Id.*) Priddy acknowledged a dispute over the buyer's premium but claimed it was paid directly to him and amounted to money that "would not otherwise have been received by any party or person interested in the Debtor's estate." (*Id.*)

The court concluded Priddy was not authorized to take the premium and but took it before he disclosed it to the court or filed his fee application. (*Id.*) Further, it found neither the other creditors nor the court were aware of the premium before the auction. (*Id.* at 10–11.) Ultimately the court found the creditors' alleged awareness of the premium inconsequential because Priddy's duty to disclose his total compensation was owed to the court. (*Id.*) Thus, Priddy "misrepresented in a direct and unequivocal way the compensation he actually intended to receive." (*Id.*)

The bankruptcy court concluded Priddy was not credible, a determination I found specifically entrusted to the bankruptcy judge which was supported by sufficient evidence. *Priddy*, 148 B.R. at 329–30. I found Priddy first testified in writing he conducted approximately thirty sales on behalf of the bankruptcy court in the 1987–1992 time period. *Id.* He later minimized his involvement claiming to have been involved in only four bankruptcy sales with the other twenty-six conducted under the auspices of the Federal Deposit Insurance Corp. *Id.* Priddy's second version only came out after he vehemently objected to the court ordering him to produce records substantiating his claimed involvement. *Id.* I found Priddy suggested his buyer's premium was a "tried and true practice" so well-known to the bankruptcy court that he should be allowed to keep the premium this time as he allegedly had in the past. *Id.* This argument, I concluded, "cut both ways" supporting the court's conclusion that Priddy was familiar with the bankruptcy court's practice and procedure and "thus supports the finding of bad faith." *Id.* I determined Priddy's later equivocation trying to minimize his bankruptcy involvement "only buttresses the conclusion." *Id.*

I upheld the bankruptcy court's finding of Priddy's bad faith violation of the Rule 9011 objective standard. *Priddy*, 148 B.R. at 329. I noted the bankruptcy judge canvassed case law covering 11 U.S.C. § 327 governing the employment of professionals and concluded it was appropriate to sanction a professional who did not fully disclose conflicts of interest. *Id.* I also noted since Priddy was not hired pursuant to § 327 and thus § 327 was not strictly applicable, Rule 9011 applied. *Id.* I upheld both the bankruptcy court's legal reasoning and its finding of Priddy's bad faith. *Id.* at 330.

On remand the bankruptcy court made the following additional findings: Priddy's counsel did not know until November 1991 of Priddy's intention to charge the buyer's premium in addition to the 20 percent commission. (R. Appeal, Vol. 1, Doc. 226 at 4.) Gleason sent Priddy a letter in August advising him that his 20% commission was subject to court approval. (*Id.*) Despite his fiduciary duty to the estate, Priddy kept the proceeds of the auction in a non-interest bearing account until at least July 29, 1993. (*Id.* at 4 and 6.) To the court, Priddy listed his net worth at $1.5 million.

Priddy's first "secret" trip to retrieve Rossmiller's property was unauthorized because he knew Rossmiller was in bankruptcy but did not seek authorization from the court. (*Id.* at 3, 6.) Priddy made the trip nearly one year before the parties agreed to the stipulation, which provided for Priddy's future costs not his past costs. (*Id.* at 3.) Priddy speciously attempted to blame other parties for his actions. (*Id.* at 6.) By analogizing to "the proverbial cookie jar," the bankruptcy court found that obliging Priddy to disgorge only the undisclosed premium

would not meet the *White I* threshold of deterring such conduct in the future. (*Id.*) The court found that requiring Priddy to return all money related to his undisclosed practices met the objective standard of *White I* for minimum deterrence. (*Id.*) The court permitted Priddy to cover his $5,262.80 in expenses for his later fully disclosed trip to California. (*Id.*)

## II. *MERITS*

Priddy presents a number of theories to support his request for yet another hearing where the court should reconsider his liability. When considering all these arguments, the underlying fact remains the bankruptcy court found Priddy's bad faith made him liable and I upheld this finding in the first appeal. *Priddy*, 148 B.R. 326.

■ Review of the bankruptcy court's decision uses an abuse of discretion standard. *White v. General Motors Corp.*, 977 F.2d 499, 501 (10th Cir.1992) ("*White II* "). *Cooter & Gell v. Hartmax Corp.* 496 U.S. 384, 405, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). This circuit set out the test and procedures for Rule 11 sanctions in *White I*, 908 F.2d 675.

■ First the court must judge the conduct against an objective, not a subjective, standard. *Id.* at 680. Second, the court must focus on deterrence as the primary goal of sanctions. *Id.* at 683. Third, the court can sanction an individual with penalties other than an award of attorney fees. *Id.* Fourth, when levying monetary sanctions, the court must consider a series of circumstances that indicate the appropriateness of a sanction. These circumstances include whether a) attorney fees are reasonable, b) the sanction is the minimum that will deter the violative conduct, c) the sanction penalizes the person responsible for the violation, d) the offender has the means to pay, e) the sanctions are appropriate considering factors such as severity of violation, experience and past sanction history. *Id.* at 684–86.

### A. *Reverse and Remand*

■ Focusing on "reverse and remand" in my first decision, *Priddy*, 148 B.R. at 327, Priddy argues that decision required the

bankruptcy court to make a new determination of the issues presented, including Priddy's liability, under the general rule of *Bankers Trust Co. v. Bethlehem Steel Corp.*, 761 F.2d 943, 950 (3rd Cir.1985). As Priddy notes, however, the rule is general. More specifically, Priddy ignored other principles upheld in *Bankers Trust*. "A trial court must implement both the letter and spirit of the mandate, taking into account the appellate court's opinion and the circumstances it embraces." *Id.* at 949 (citations omitted). "The mandate and its opinion must be considered together in their entirety with particular reference to the issues considered." *Id.* at 950 (citations omitted), *see Estate of Whitlock v. Commissioner of Internal Revenue*, 547 F.2d 506, 510 (10th Cir.1976), *cert. denied*, 430 U.S. 916, 97 S.Ct. 1329, 51 L.Ed.2d 594 (1977). "A trial court is thereby free to make any order or direction in further progress of the case, not inconsistent with the decision of the appellate court, as to any question not settled by the decision." *Id.* at 950. Furthermore, *Estate of Whitlock v. Commissioner of Internal Revenue*, 547 F.2d 506, 510 (10th Cir.1976), holds the court's opinion may be consulted to ascertain the intent of its mandate.

Considering "reverse and remand" in the context of the entire opinion, the letter and spirit of the opinion clearly hold Priddy liable. First, I "reluctantly" reversed because the bankruptcy court failed to consider several factors from *White I* regarding the appropriateness of sanctions, not of liability. *Priddy*, 148 B.R. at 327. Second, I agreed with the bankruptcy court's decision that ample and sufficient evidence supported the finding of Priddy's violation of the objective standard of good faith. *Id.* at 330. Third, I held the bankruptcy court did not abuse its discretion in finding Priddy acted in bad faith and violated Rule 9011. *Id.* at 330.

Consequently, the intent of the mandate is clear. In fact, the bankruptcy court could not reconsider Priddy's liability and be consistent with the earlier decision, since it settled the matter of Priddy's liability.

### B. *Priddy's Relationship to his Attorney(s)*

■ Priddy's relationship to his attorneys provides grist for several of his arguments.

Despite his counsel's protestations to the contrary at the May 5, 1995 hearing, several of Priddy's briefs argue that his attorney(s) were responsible for the affidavit and stipulation, which were the source of the bad faith finding that led to sanctions. (Appellant's Br. at 15, R.Appeal, Vol. 1, Doc. 220 at 3.)

### 1. Conflict of Interest

The potential conflict of interest between Priddy and his counsel is one theory Priddy maintains to justify a new hearing. (Appellant's Reply Br. at 4.) At the April 13, 1992 hearing Priddy was represented by his attorney, Richard Gleason, whom he now alleges is responsible for any liability for sanctions. The court in *White I* confronted such a conflict where the attorney represented the client in a hearing for sanctions potentially applicable to both of them. It resolved the issue by directing the lower court to, "make more specific findings regarding who bears the fault for the various actions warranting sanctions." *White I,* 908 F.2d at 686.

I ordered the bankruptcy court in this case to do just that when I ordered it to consider "whether sanctions should be imposed on the auctioneer only." *Priddy,* 148 B.R. at 330. The bankruptcy court heeded this order and Priddy's complaint by holding a hearing on Gleason's liability and then finding him not liable. Deciding whether fault extended to others does not disturb the bankruptcy court's original finding that Priddy is liable.

### 2. Liability in relation to his Attorney(s)

In a related theory, Priddy argues the bankruptcy court should have considered the relative fault of Priddy and his lawyers. (Appellant's Br. at 14.) The court, therefore, should have reexamined whether Priddy had any liability. (*Id.*)

To begin with, I note one must have fault to apportion it. Next, I note the bankruptcy court found nobody else at fault leaving no one against whom to balance Priddy's fault. The bankruptcy court specifically inquired into the fault of Priddy's lawyer and did not find grounds for sanctions. Notably, the Tenth Circuit in *White I* did not require the lower court to reconsider *de novo* the liability of the parties. Rather, it called upon the

lower court to make more specific findings as quoted above. *White I,* 908 F.2d at 686.

I remanded to the bankruptcy court for it to determine whether it should sanction any one in addition to Priddy and the amount to be levied against him. *Priddy,* 148 B.R. at 130. These orders essentially are an examination of the level of Priddy's fault as mandated by *White I,* 908 F.2d at 686. The bankruptcy court did not have to revisit the threshold issue of Priddy's liability, to make this examination.

### 3. Relevance of Gleason's Advice

Priddy argues Gleason should have testified about his legal advice to Priddy after Gleason was informed by other creditors that Priddy's buyer's premium was an issue. (Appellant's Br. at 22.) He argues if Gleason had testified the buyer's premium was not gross proceeds payable to the estate, then such evidence would have tended to show Priddy was unaware of any wrongdoing. (*Id.*) According to Priddy, the critical missing evidence is what his attorney's legal advice to Priddy was regarding the buyer's premium. (*Id.* at 21.)

Priddy argues this evidence is relevant to his state of mind or awareness of wrongdoing. (*Id.* at 22.) Gleason's legal advice in November 1991, however, is not reflective of Priddy's state of mind in June when he signed and filed his affidavit and agreed to the stipulation. The court noted Gleason's advice came in November 1991 "after the fact" of Priddy's violation. (R. Appeal, Vol. 3 at 75.) In June 1991 Priddy signed the affidavit where he agreed to a commission of 20% of the "total amount" of the auction proceeds and mentioned nothing about a buyer's premium. (R. Appeal, Vol. 1, Doc. 141.)

Regarding Gleason, the bankruptcy court concluded, "It is unfortunate that in the fee application counsel asserted Mr. Priddy's intransigent position that the auctioneer was entitled to the buyer's premium." (R. Appeal, Vol. 1, Doc. 226, at 1.) However, it concluded that Gleason's acceding to his client's wishes did not warrant sanctions. (*Id.*)

According to Priddy, the bankruptcy court's reference to counsel's position in No-

vember is relevant to Priddy's state of mind at the time of his violation. (Appellant's Br. at 21.) If anything, the statement refers to the misfortune of all involved—Gleason, Priddy, the other parties and the courts—of continuing litigation that should have been resolved long ago.

#### 4. The Attorneys' Awareness of the Premium

At a hearing on May 5, 1995, Priddy argued Gleason's November statement along with other evidence demonstrated Gleason and his employer, Berkowitz, Brady and Backus, P.C. were aware of Priddy's practice of charging a buyer's premium before Priddy submitted the affidavit. The point, according to Priddy's counsel, is not that the attorneys are also liable, but that they, like Priddy, did not view the premium as significant enough to include in the affidavit, it being common auction practice.

First, I note this argument depends on Priddy's discredited testimony that the buyer's premium was an insignificant but constant practice of his in accord with common auction practice. Next, Gleason testified that when he became aware of the buyer's premium he assumed it would be accounted for in the gross proceeds. (R. Appeal, Vol. 1, Doc. 226 at 2.) The bankruptcy judge specifically found that Gleason was unaware that Priddy would charge the 10% buyer's premium in addition to the 20% commission before November 1991. (*Id.* at 5.) Finally, although the parties dispute the significance of whether other firm lawyers knew about the buyer's premium, Priddy has not demonstrated the more important fact that in addition to knowing about the premium, they knew it would not be accounted for in the gross proceeds of the sale.

#### C. Application of Rule 9011

█ Priddy raises a number of objections to the bankruptcy judge's application of Rule 9011 sanctions to him. These arguments largely rely on challenges to law and facts already affirmed in my earlier decision.

In her first decision, the bankruptcy judge's analysis of the legal principles behind disclosure in 11 U.S.C. § 327 and behind the good faith standard in Rule 9011 soundly grounded the application of Rule 9011 to Priddy. (R.Appeal, Vol. 1, Doc. 180 at 5–10.) I affirmed the bankruptcy's court's reasoning: "In short, ample and sufficient evidence supported the bankruptcy court's decision. It did not abuse its discretion in finding that the auctioneer acted in bad faith and in violation of Rule 9011." *Priddy*, 148 B.R. at 330.

#### 1. Rule 9011 Applied to a Lay Person

Because he is a layman, Priddy argues the legal rules of disclosure embodied in Rule 9011 do not apply to him. (Appellant's Suppl. Reply Br. at 4.) Priddy alleges the supposedly unsettled nature of sanctions law also makes the rules peculiarly inapplicable to him since his lawyer should be sanctioned before he can be, citing to Mr. Justice Kennedy's dissent in *Business Guides Inc. v. Chromatic Communication Enter. Inc.*, 498 U.S. 533, 555, 111 S.Ct. 922, 935, 112 L.Ed.2d 1140 (1991).

It is indeed a dissent. The bankruptcy judge accurately applied the majority's holding that Rule 11 sanctions apply to people who sign court pleadings, not only attorneys. *Id.* at 544, 111 S.Ct. at 929–30. I upheld her application of the reasoning to Rule 9011 and its application to Priddy. *Priddy*, 148 B.R. at 330.

#### 2. Principle behind § 327

Priddy argued any analogy to 11 U.S.C. § 327 was obviously inappropriate because it specifically applies to disinterested professionals hired by the estate whereas Priddy was an interested party. The argument misses the obvious. Precisely because Priddy was an interested party, the law requires no less a level of duty from Priddy that it would demand of disinterested parties in order to ensure Priddy does not place his interest above the estate's interest. Since the bankruptcy judge found this is precisely what happened in this case, the analogy to § 327 is poignantly persuasive.

#### 3. Priddy's Bankruptcy Experience

Priddy argues the full disclosure requirement does not apply to him because he was unaware of any disclosure requirements. (Appellant's Suppl. Reply Br. at 4.) Once

again Priddy bases his argument on his already discredited assertions.

At the May 5, 1995 hearing, Priddy argued his past auctions took place before disclosure was required. To the contrary, Priddy testified he had conducted approximately thirty sales on behalf of the bankruptcy court in the five years before 1992. (R. Appeal, Vol. 1, Doc. 174 at 1.) The newer bankruptcy rules were amended in 1978 to require an auctioneer to file an affidavit disclosing all compensation.[1] Even though he later reneged on this testimony, Priddy still admitted to four sales on behalf of the bankruptcy court during the 1987–1992 time period. (R. Appeal, Vol. 1, Doc. 179 at 2.)

The bankruptcy judge did not find Priddy's assertions to the contrary credible. However, she did find compelling the evidence of Priddy's experience with bankruptcy. (R. Appeal, Vol. 1, Doc. 226 at 6.) As noted in my first decision, evidentiary findings, such as Priddy's credibility, were determinations entrusted to the bankruptcy judge and she did not abuse her discretion in making such findings. *Priddy,* 148 B.R. at 329.

### 4. *Priddy's Acts against an Objective Standard*

Rule 9011 requires courts to evaluate whether a party should be sanctioned against an objective standard. *White I,* 908 F.2d at 680. Priddy offers several explanations for his non-disclosure of the buyer's premium that *White I* requires the court measure against an objective standard. Regardless of the legal merit of his explanations, I reiterate that all his explanations rely on his own discredited testimony.

One of Priddy's earliest attempted explanations, in his January 1992 amended application for fees, (R. Appeal, Vol. 1, Doc. 159 at 2,) is telling. Priddy left out the buyer's premium monies from the gross proceeds

because it "represents monies which would not otherwise have been received by any party or person interested in the Debtor's estate." *Id.*

Priddy fails to appreciate he is part of a process. If he had not charged the premium, the estate would not have been able to collect it. If the estate had not contracted with Priddy, however, he would not have had anything to sell upon which to attach his buyer's premium. The interests of the two parties reach common ground in Priddy's affidavit and the court-approved stipulation.[2] (R. Appeal, Vol. 1, Docs. 141, 144.) Those documents called for Priddy to receive 20% of the "gross proceeds". (R. Appeal, Vol. 1, Doc. 180 at 1.)

With the exception of Priddy, everyone involved—the other parties, his lawyer, Gleason, the bankruptcy judge—understood the plain language of "gross proceeds" to include all monies from the sale regardless of the label.[3] Judging his affidavit and stipulation under an objective standard, Priddy should have known he was required to include his buyer's premium in the gross proceeds.

At the May 5, 1995 oral argument in the instant appeal, Priddy's counsel argued there was no evidence that without the buyer's premium, the auction "would have generated one microbit more money." Such evidence, of course, would not be relevant; the gravamen is the failure to account accurately, not to profit considerably. Nevertheless, Clifford Eley, trustee for the estate, engaged the digression. He explained the common understanding of consumer habits, which Priddy should have appreciated after long years of selling to the public, and why it augurs against his assertion.

### 5. *Specifying the Wrongful Act*

At the May 5, 1995 hearing Priddy also attacked the bankruptcy judge's Rule 9011

---

**1.** According to testimony of a U.S. trustee, before 1978 in Colorado, the 11 U.S.C. § 327 application and affidavit process was not in effect. Before then, auctioneers were appointed by a panel. The court notes, however, Priddy only began charging the buyer's premium in 1987, long after these requirements took effect in Colorado.

**2.** The bankruptcy judge's order further required all of the auctioneer's fees and expenses to be

subject to prior court approval. (R. Appeal, Vol. 1, Doc. 144.)

**3.** "Total amount" is the equivalent wording to gross proceeds used in the affidavit, whose plain meaning likewise indicates all fees and commissions, including the buyer's premium, were to be included in sales total. (R. Appeal, Vol. 1, Doc. 141 at 1.)

reasoning maintaining she did not specify what Priddy did wrong. He asserted Rule 9011 sanctions people for falsely signing statements not for any other conduct. He argued the bankruptcy judge cited Priddy's conduct as the basis for his liability.

While Priddy correctly spotlighted the signed statement as the sanctionable wrong, a statement in a vacuum is never false. It becomes false, when in a case such as Priddy's, the affiant pledges to earn a 20% commission in his statement and then proceeds to act differently, in this case garnering an additional 10%. The bankruptcy judge pointed to Priddy's conduct to show he had not acted in accord with his signed statement. Therefore, she concluded and I affirmed, Priddy signed the statement in bad faith making him subject to sanctions under Rule 9011. *Priddy*, 148 B.R. 330.

### 6. *Affidavits as Rule 9011 Statements*

Priddy also suggested at the May 5, 1995 oral argument Rule 9011 does not sanction affidavits, but only a "list, schedule or statement" signed by a non-attorney. Black's Law Dictionary 28 (abridged 5th ed. 1983) defines an affidavit as, "[a] written or printed declaration or statement of facts, made voluntarily, and confirmed by the oath or affirmation of the party making it, take before a person having authority to administer such oath or affirmation."

### 7. *The Amount of Sanctions*

Priddy makes several arguments that apply to a determination of the amount of sanctions against him, not his underlying liability.

#### a. *Subjective Awareness*

He argues he was unaware his buyer's premium amounted to wrongdoing. (Appellant's Suppl. Reply Br. at 4.) Once again this argument rests on his discredited testimony.

It also, however, rests on a problematic legal distinction. When determining who and how much to sanction, *White I* included a subjective component that the sanctioned party be aware of the wrongdoing. *Id.* at 685. The subjective awareness component must be understood in light of the mandate earlier in the *White I* opinion calling for an

objective standard for evaluating a party's conduct. *Id.* at 680. "A good faith belief in the merit of an argument is not sufficient; the attorney's belief must also be in accord with what a reasonable, competent attorney would believe under the circumstances." *Id.* Applying the principle more broadly, professionals cannot shield their incompetence or ignorance behind their own benighted beliefs. *See White I*, 908 F.2d at 680.

The *White I* court first established an objective standard for Rule 11 liability and only later, when determining who to sanction and how much to sanction, introduced a subjective awareness component. *Id.* at 683. Priddy's awareness cannot affect his liability. He cannot shield his wrong behind his alleged ignorance of the fact charging and not disclosing the premium would be wrong. *White I*, 908 F.2d at 680. Otherwise the subjective awareness component of the analysis would make the objective standard pointless.

Priddy's awareness of wrongdoing, however, could affect the sanctions against him. In *Schrag v. Dinges*, 150 F.R.D. 664, 681–83 (D.Kan.1993), the court applied an objective standard to determine liability and then later applied the subjective awareness criteria to determine which individuals would be liable for how much of the sanctions. Since the plaintiffs were sanctioned for misleading legal arguments and reliance on inapplicable law, the court ruled sanctions applied to the attorneys but not to the clients because no showing was made that the clients authorized misleading arguments or knew counsel relied on inapplicable law. *Id.* at 683.

In contrast to *Schrag*, the situation here is reversed. Priddy, the client, knew of and carried out the sanctionable wrong—non-disclosure of the buyer's premium—while the court found counsel was ignorant of the sanctionable conduct. (R. Appeal, Vol. 1, Doc. 226 at 4.) Priddy testified he knew he was going to charge the premium when the parties agreed to the stipulation. (*Id.*) In her first decision, the bankruptcy judge found his explanations for not disclosing the premium not credible and I affirmed the finding. *Priddy*, 148 B.R. at 329. Consequently, the record establishes Priddy was aware of his wrongdoing giving neither the bankruptcy

judge or me reason to alter the sanctions against him.

### b. *Minimum Amount of Sanctions*

Priddy also complains the bankruptcy court did not address the minimum sanction requirement of *White I*. (Appellant's Suppl. Reply Br. at 3.) To the contrary, the bankruptcy judge held, "[t]he severity of his actions cannot be exonerated merely by putting the inappropriate premium back in the proverbial cookie jar." (R. Appeal, Vol. 1, Doc. 226 at 6.) While expressed colloquially, she concluded merely obliging Priddy to return the ill-gotten premium would not adequately deter the undesirable behavior and thus did not meet the minimum deterrence threshold of *White I*, 908 F.2d at 684.

At the May 5, 1995 oral argument, Priddy argued, on the one hand, the bankruptcy judge simply failed to discuss the minimum sanction. Alternatively, he argued the cookie jar analogy does not rise to the dignity of a finding required by the Tenth Circuit. *Id.* If the analogy reflects anything more than verve, it suggests the bankruptcy judge's desire to make her point clear to Priddy, especially since in the past he misconstrued her reasoning.

Finally, the bankruptcy judge's sanctions reflect a specific finding of the minimum required to deter Priddy. She prevented him from keeping the fruits of his wrongful conduct. She denied his petition for expenses from his unauthorized trip and prevented him retaining any earnings from the auction tainted by his bad faith. She did permit him to recover his expenses for his authorized trip to California.

Despite these findings, Priddy argues the bankruptcy judge should have parsed her finding in more detail. I criticized just this sort of effort in the first opinion stating, "it is the kind of minimalist functioning which defeats the very object of the underlying rule." *Priddy*, 148 B.R. at 330. I reason that the bankruptcy judge has effectively blended the mandate of *White I* and my direction to find a sanction that minimally sanctions Priddy while still carrying out the purpose of the rule to deter such conduct in the future.

The bankruptcy judge found several of Priddy's actions indicated he filed the affidavit and signed the stipulation in bad faith. These actions included Priddy's non-disclosure of the buyer's premium and his retrieval of Rossmiller's property without court approval. Moreover, she found Priddy's attitude toward the bankruptcy process manipulative and disrespectful. (R. Appeal, Vol. 1, Doc. 226 at 6.)

These are substantial reasons for denying Priddy all but the $5,262.80 in expenses he incurred in his second, court approved trip to California to collect the debtor's property. The sanction is not the "hammering" Priddy alleges since it only negates his earning from his wrongful activity. It does not make him disgorge his earnings from any other work.

### 8. *The Buyer's Premium as Normal Course of Business*

Priddy argued at the May 5, 1995 hearing to the effect that the goal of business is to increase income whether or not it comes at the public's expense. I gather the point of this argument was that the bankruptcy judge was sanctioning Priddy unfairly for the everyday business practice of maximizing income.

Such, however, distorts the bankruptcy judge's reasoning. Rule 9011 sanctions are not intended as a consumer protection device. The bankruptcy judge's order penalized Priddy because he denigrated the integrity of the bankruptcy process. (R. Appeal, Vol. 1, Doc. 180 at 10.)

### III. *CONCLUSION*

The bankruptcy judge accurately applied the rules of full disclosure and Rule 9011 sanctions to Priddy as interpreted in the cases of *Business Guides* and *White I*. On remand the bankruptcy judge accurately followed the mandate giving proper consideration to the *White I* factors. I AFFIRM the bankruptcy court's decision denying Priddy compensation other than the $5,262.80.